Arthur James JULIUS,
Petitioner–Appellant,

v.

Charlie JONES, Warden, Holman Unit,
Respondent–Appellee.

No. 89–7089.

United States Court of Appeals,
Eleventh Circuit.

May 31, 1989.

Thomas M. Goggans, Montgomery, Ala., Julius L. Chambers, Richard H. Burr, III, George H. Kendall, New York City, for petitioner-appellant.

Don Siegelman, Ed Carnes, Attys. Gen., Montgomery, Ala., for respondent-appellee.

Before VANCE, HATCHETT and CLARK, Circuit Judges.

PER CURIAM:

This is an appeal from the district court's denial of petitioner's second petition for habeas corpus relief. We have reviewed the materials submitted by appellant and so much of the record as pertains to the points argued. Finding that the district court made no error, we AFFIRM the district court's order and amendment, attached as an Appendix.

APPENDIX

In the United States District Court

for the Middle District of Alabama

Northern Division

Arthur James Julius, Petitioner

vs.

Charlie Jones, Warden, Holman Unit, Respondent.

Civil Action No. 89–H–84–N.

MEMORANDUM OPINION

This Court has issued an order denying petitioner's habeas corpus petition, but finding probable cause for appellate review of this order and granting petitioner a stay from the imminent execution of his death sentence in order that petitioner can effect said review. This Court now issues its memorandum opinion stating the reasons for its Orders entered January 25, 1989.

PRIOR PROCEEDINGS

The petitioner was convicted of capital murder in September, 1978. He was found guilty of murdering his cousin while on a pass from prison where he was serving a life sentence. His 1978 sentence of death was reversed by the Alabama Supreme Court due to a decision by the United States Supreme Court that the Alabama death penalty statute was unconstitutional. See *Ex parte Julius*, 407 So.2d 152 (Ala. 1981).

After the Supreme Court of Alabama cured the constitutional vice of the Alabama statute, petitioner was retried. On April 20, 1982, petitioner was again convicted of murder, and on May 24, 1982 was again sentenced to death by the Circuit Court of Montgomery County, Alabama.

After his conviction and sentence were affirmed by both the Alabama Court of Criminal Appeals and the Supreme Court of Alabama, the United States Supreme Court denied petitioner's petition for writ of certiorari in January, 1985. Petitioner then filed a writ of error coram nobis petition in the Circuit Court of Montgomery County. Following an evidentiary hearing, the petition was denied. This action was reviewed and affirmed by the Alabama Court of Criminal Appeals. Petitioner then filed a petition of habeas corpus in this Court in August 1985. After said petition was denied by this Court, petitioner appealed to the Court of Appeals for the Eleventh Circuit, which affirmed the denial of the writ. 840 F.2d 1533 (1988). On an application for rehearing, the Court of Appeals modified its opinion but denied the application for rehearing. 854 F.2d 400 (1988).

Petitioner again unsuccessfully sought review in the Supreme Court of the United States.[1]

On January 17, 1989, petitioner filed a petition for post-conviction relief in the Circuit Court of Montgomery County. An evidentiary hearing was held on January 21, 1989 before Judge Gordon and on January 22, 1989 the Circuit Court issued its opinion denying the petition wholly on the ground that petitioner was procedurally barred from having any of his asserted grounds for relief considered because such grounds were known or could have been known at trial or on previous post-trial challenges to petitioner's conviction. Because this Court is unable to agree that all of petitioner's asserted grounds in his 1989 petition should be procedurally barred, the Court will address why these claims should not be procedurally barred, and will state why, although not procedurally barred, they are insufficient to justify the granting of the writ.

Petitioner presents five separate claims which he argues entitle him to a writ of habeas corpus. Claim I is based on newly discovered evidence of an exculpatory nature which was suppressed by the prosecution. Claim II alleges prosecutorial misconduct by the knowing use of false or misleading testimony. Count III alleges error in the prior denial of petitioner's claim that he was denied a fair trial by failing to receive a jury instruction on a lesser included offense. Claim IV alleges error in the prior denial of plaintiff's ineffective assistance of counsel claim. Lastly, Claim V alleges error of constitutional magnitude in the trial court's jury instructions at the sentencing phase of his trial. The Court will address each of these claims individually.

## I. CLAIM I: NEWLY DISCOVERED EVIDENCE OF AN EXCULPATORY NATURE

Petitioner contends that the State violated the rule in *Brady v. Maryland,* 373 U.S.

83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) by failing to produce allegedly exculpatory evidence when requested by defense counsel. Defendant was convicted of the murder of Susie Sanders who was found dead, nude, physically abused and apparently strangled in her home by her father shortly after 5:00 p.m. on the afternoon of January 29, 1978.

### A. *Wheeler Allegedly Exculpatory Material*

The evidence at trial from Ms. Wheeler was that around 4:00 p.m. on the afternoon of January 29, she called the victim on the telephone. After a brief conversation the victim Susie Sanders told Ms. Wheeler that she was going to talk with her cousin Bobo and she would call Ms. Wheeler right back. Ms. Wheeler testified that if Ms. Sanders had company when she called, Ms. Sanders would usually tell you she would talk to you later. (Tr. 223)

Petitioner suggests that because a police report used the name Bozo rather than Bobo, failure to produce this record was a violation of the *Brady* rule. But the transcribed notes of the police officer who took Ms. Wheeler's statement on January 29 reported the name as Bobo. It was in the typed reproduction that the name "Bozo" appeared. Ms. Wheeler testified at the trial and before the grand jury that the name was Bobo.

Mrs. Sanders, the mother of the victim, testified that she had a nephew who called himself Bobo, and she had heard her daughter call him Bobo. Others also had heard the defendant called Bobo. Petitioner is entitled to no relief because in one typed police report, the word is typed Bozo.

In his brief, petitioner also suggests that if his trial counsel had been aware that Ms. Wheeler had given a statement to the police that in their afternoon telephone conversation the victim had said she was going to talk to her cousin Bobo, this would have allowed reasonable jurors to conclude that Bobo was not at her house but that she

was going to meet him elsewhere (Petr's brief R. 25). Petitioner, therefore, argued that *Brady* was violated when this report was not furnished. But Ms. Wheeler's trial testimony was precisely along the line of the alleged newly discovered exculpatory evidence. She testified that Ms. Sanders said: "Let me go talk to my cousin Bobo and I'll call you right back." (Tr. 223)

The Court finds nothing in Ms. Wheeler's testimony that would be exculpatory or that was different than the trial testimony by Ms. Wheeler.

### B. *Gray Allegedly Exculpatory Material*

A young man, William Gray, Jr., who was a high school student at the time of the murder, testified that he had seen a car which in some particulars answered the description of a car driven by petitioner on the date of the murder. Gray placed the car at the victim's house about 5:10 or 5:15 p.m. Petitioner had that day borrowed a car from his cousin, Willie Clayton, after petitioner was released from prison on a pass. Petitioner had inquired of Mr. Clayton about Susie Sanders before Clayton lent petitioner his car. Clayton testified that petitioner had his car from 3:30 p.m. to 6:25 p.m.

Petitioner argues that there was a failure to disclose to the defense that Gray, when initially questioned by the police, gave a false name and address. Gray testified at trial that he left home to take his sister to work at about 4:50 or 4:55 p.m. on the day of the murder. He picked up some food at a drive-through restaurant, and on returning home saw a car parked in front of the victim's house. He identified the car from a photograph as the one which was the borrowed car driven that day by defendant.

The initial interview with Gray took place when Gray was stopped for speeding while driving his sister's car. Officer Helton who stopped Gray made a report of the conversation the next day. In the report he described Gray's traffic violation and reported that Gray explained his speeding by referring to the fact that his cousin had just been strangled. Gray reportedly apologized for the speeding and told the officer that he had passed the victim's house that afternoon and had seen a car there that he had never seen there before. He reportedly said the car was in the driveway but that "he did not want anything to come back on him because he had told me about this." He then gave the officer a false name and address. Gray described the car reportedly in the driveway as a Ford LTD about a '68 model with a cloth top that had colors of green, white and gold in it.

The following day Officer Helton went to the Gray home with Officer Duncan who filed a report stating that the officers talked to William Gray, Jr. in his father's presence. At this occasion there is no mention in the report of Gray making any reference of seeing the car. He described taking his girl friend home the previous afternoon and returning directly to his house. After the officers left the house, Officer Helton told Officer Duncan that he was sure Gray was the same person whom he had stopped for speeding the previous day.

At a follow-up interview on January 31 at Carver High School, police officers again interviewed Gray, Jr. On this occasion, a report in the police files states that Gray, Jr. told the officers:

On this date we went to Carver High School and contacted Det. Davis School Relations Officer at that location, and in the presence of Det. Davis, we did talk with William Gray, Jr., b/m, age 16, 3125 Mobile Dr., 265–1861. After talking to him at some length he finally advised us that on the day of this incident that he had took his sister, Linda to work at Hardee's on Fairview and dropped her off approx. 10 minutes until 5:00. He stated from there he went to McDonald's on Fairview and ordered a hamburger to go and after getting hamburger he departed McDonald's and drove the back way back to his home. He described this back way as taking him past the victim's house in this case. He stated it was probably 5:00 or 5:10 PM when he went by the victim's house and that he drove

by her house he did see a Ford sedan somewhere between 1967–1971 model, green in color with plaid top. He stated the top of the car looked odd because it was kinda light green, yellow and white looking color. He stated the car was parked on the side of the street that Susie's house was on and that car was parked facing the oncoming traffic. Going into more detail he stated that on the previous Sunday he had observed the car drive past his house from direction of victim's house and that a black male had been driving the car. He described the black male and when given a series of black and white photographs in which the defendant's picture was included, he looked through photographs and picked the defendant as being individual who had been driving the car on previous Sunday. He did report that car he saw on the previous Sunday was the same car he had seen parked in front of the victim's house on the date of this incident. At the time we talked with him he did not give us a written statement and later on in the day we went to his house on Mobile Dr. and his mother and father brought him to the Detective Office where he did give us a written signed statement in the presence of his parents concerning the above incident. . . .

This Court has read Gray's trial testimony, and it is substantially as reported in the police file in the January 31 interview (R. 59–66).

Petitioner argues that the prosecutor was required to produce all the reported interviews of Mr. Gray because in one of the interviews he gave a false name and address and falsely reported that it was his cousin who was strangled (Gray is no relation to the victim) and in another interview did not mention seeing the car which was later identified as having been driven by defendant on that afternoon. Moreover, one report stated that Gray had placed the car in a driveway rather than on the street.

The Court is of the opinion that the furnishing of all the reported interviews with Mr. Gray was required under *Brady v.*

*Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady* requires that evidence that is both favorable to the defendant and "material to either guilt or punishment" must be produced.

On analysis of all the reported interviews, the Court is of the opinion that defense counsel could have made some use of the three or four interview reports. Defense counsel could have argued the unreliability of the testimony of one who gave a false identification and address to the police, even though the statement of false identity was next to the reported statement that Gray did not want to become involved in the strangulation death of his cousin.

Clearly in the opinion of this Judge, the better practice for the prosecutor would have been to produce the reported interviews, and the Court will treat such production as being required by *Brady.* However, although this Court would have compelled production of these documents at the trial level, their suppression does not necessarily warrant an automatic grant of the writ. A court may order a new trial on the ground of suppression of *Brady* material "only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3382, 87 L.Ed.2d 481 (1985).

Evidence that the defendant was at the victim's home on the afternoon of her death also came from a statement by defendant, although defendant placed the time he was at the house earlier in the afternoon than the time Mr. Gray's testimony placed him there.

As the Court of Appeals stated in its 1988 opinion in an earlier habeas petition of this petitioner: "Although the evidence convicting Julius was all circumstantial, it was overwhelming." *Julius v. Johnson,* 840 F.2d 1533, 1541 (11th Cir.1988). This Court has read the trial transcript with the significance of the withheld testimony in mind, and such reading confirms the contention of the State that there is no reason-

able probability that had this evidence been disclosed, the result would have been different.

### C. *Other Person Allegedly Exculpatory Evidence*

On the night of the murder, the police sought any information which might give them a lead on any individual who might have committed the crime. They did have reports which showed that the victim had received phone calls with heavy breathing and harassing phone calls during the period of a week or more prior to her death. There was in the reports that she had other boy friends than her fiancee. There was a reported statement that the father of the victim's daughter was unhappy about the victim's proposed marriage. As with the Gray reported interviews the Court is of the opinion that these reports should have been produced under the *Brady* rule. As with the Gray reports, however, the Court concludes that there is not a reasonable probability that the disclosure of the evidence would have altered the result.

### D. *Broken Eyeglasses and Evidence that Mr. Sanders Did Not Know of Bobo Nickname Exculpatory Evidence*

Petitioner also contends that a statement in the police files that the victim's father did not know anyone named Bobo and that a pair of broken glasses were found at the murder scene would have been exculpatory. The Court fails to see the materiality of the glasses. As for the father not knowing the defendant by the name of Bobo, there was evidence at the trial from a friend of the victim that when she was in the presence of the victim and defendant on two occasions, she never heard him called Bobo (Tr. 263). On the other hand, in addition to Ms. Wheeler's statement that Susie was going to talk with her cousin Bobo, Susie's mother and Jessie Bullard had heard Susie refer to defendant as Bobo, although Ms. Bullard was not clear as to whether the name was Bobo, Lobo, Jabbo, or something similar. Defense counsel made an issue at the trial as to whether persons knew defendant as Bobo. Defense counsel knew even before the first trial that the victim's father would be a witness. If the defense deemed his testimony on this point as critical, it certainly could have made inquiry. The Court does not deem his testimony as anything more than cumulative of the fact established by the defense without dispute that certain friends of the victim had never known of the nickname Bobo. The Court does not deem the failure to produce Mr. Sanders' statement as justifying the issuance of a writ. *United States v. Bagley, supra.*

### E. *Inventory List Exculpatory Evidence*

Petitioner told Mr. Clayton on the day Mr. Clayton lent petitioner his car that petitioner only had eight cents. When Mr. Clayton met petitioner about 6:30 p.m. on the afternoon of the murder, petitioner had money. He had bought gas for the car and offered to give some money to Mr. Clayton. He told Mr. Clayton that a girl had given him the money when they went to a motel together.

The State showed that the victim's fiancee had given her thirty dollars the morning of her death. This created a basis for believing that petitioner had taken this sum from the victim. Among the documents delivered to defense counsel in December, 1988, was a property inventory reflecting that a twenty-dollar and a ten-dollar bill were recovered by the police from the victim's residence.

The Montgomery County Circuit Court found that petitioner failed to show that the basis of this claim was unknown to him or that his counsel could not have ascertained this information through reasonable diligence at least by the time of petitioner's second trial, or at the time of the first coram nobis proceeding in 1985. The Circuit Court pointed out that defense counsel never sought the property inventory. The knowledgeable Circuit Judge expressed the opinion with which this Court has no basis for disagreeing that had it been sought it would have been produced. Finally, the

Circuit Judge referred to the testimony of petitioner's present counsel that if he had read the trial transcript from the 1978 and 1982 trials, and had exercised reasonable diligence in tracking the chain of custody of the currency, he would have discovered the property inventory. Since defense counsel must concede that due diligence would have enabled him to obtain the information on the property inventory, procedural default appears to be correct. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986).

The presence of the money in the house does not rule out the contention of the State that the defendant took money from the house after strangling the victim. Petitioner's relative, Mr. Clayton, testified as to defendant's implausible explanation relative to the money. The Court is not of the opinion that the property inventory would have been of such materiality as to justify granting the writ.

## F. *Exculpatory Evidence and Procedural Default*

Judge Gordon, who conducted a lengthy evidentiary hearing on the instant petition on January 21, 1989, concluded that the claims based on allegedly newly discovered exculpatory evidence were procedurally barred because the petitioner or his counsel knew of the material or through the exercise of reasonable diligence could have secured the material. In part Judge Gordon may have logically based this opinion on the fact that as soon as petitioner's counsel in December of 1988 asked attorneys at the Attorney General's office if there was any *Brady* material *in the police reports*, the attorneys immediately set about to collect all the materials in the files of the Montgomery Police Department and made the files available to counsel for petitioner. This surely could have been done on petitioner's appeal or on his 1985 habeas petition. In both of these proceedings, the

State was also represented by the Office of the State Attorney General.

Petitioner's attorneys assert that they did not ask earlier for the police files because they had assumed the Montgomery district attorney's office had provided the *Brady* material. They state that they had cause to suspect this might not be true when the Supreme Court of Alabama in *Ex Parte Clarence Womack*, 541 So.2d 47 (Ala.1988), reversed a conviction because of failure of the Montgomery district attorney's office to provide clearly exculpatory materials in violation of *Brady*.

This Court is unwilling to hold on the facts of this case that, if the prosecutor failed to produce evidence which was required to be produced under *Brady* and which failure was unknown to defendant's counsel, the claim is procedurally barred because defense counsel did not ferret out the violation. Such a ruling would reward the wrongdoer because he was not timely found out. This Court feels strongly that the repeated delays and appeals which take many years of almost endless litigation are serious and flagrant flaws in our judicial system. The rule that invokes a procedural bar in most instances is a much needed and salutary rule, but not if it is to be applied because the defendant's counsel was too trusting and accepted the representations of the prosecutor. Defense counsel should be able to rely on a belief that prosecutors will comply with the Constitution and will produce *Brady* material on request.[2]

Although concluding that a procedural bar is not appropriate, this Court nevertheless has denied the writ because it has found that, even if such reports should have been produced it is not reasonably probable that they would have caused a different result. Because the state courts have not considered this newly produced evidence on the merits, viewing such issue as procedurally barred, this Judge is the only judge who has considered petitioner's claims with respect to this evidence. The

**2.** The Court concedes that whether a statement is exculpatory and subject to production under *Brady* is not always free of doubt. The safe

course for the prosecutor is to produce the statement for *in camera* inspection by the court where there is reasonable cause for doubt.

Court believes that in this capital case another court should review this Court's conclusion as to whether such evidence requires an issuance of the writ under *Bagley.* For this reason, this Court has found probable cause for the appeal and has stayed petitioner's execution until such review has been effected.

## II. CLAIM II: KNOWING USE OF FALSE OR MISLEADING EVIDENCE; THE FORENSIC TESTIMONY

Petitioner filed a claim before Judge Gordon in the Circuit Court that the State's expert serologist, William Landrum, knowingly created a false impression concerning a semen stain on a nightgown found at the victim's house after her murder. After the hearing before Judge Gordon on January 21, petitioner withdrew the charge of knowingly creating a false impression. Landrum had testified that the stain on the victim's nightgown was a pure semen stain; that the person leaving the semen stain had AB type blood. He further testified that both the victim and the defendant had AB type blood, and only about four percent of the population have AB type blood.

Petitioner's expert who testified before Judge Gordon stated that in attempting to determine the blood type of a male donor in a semen stain, it is important to know whether the stain is a pure semen or whether it is a stain mixed with physiological fluids from the female because if the female is a secretor, her fluids could mask the presence of the male donor's blood. [It is admitted that petitioner is a secretor, and it is impossible to determine after her death whether the victim was a secretor.] Petitioner's expert thought Landrum should have done further testing than was done to verify that the semen stain was not a mixed stain. He testified that Landrum's testimony could be true that the stain was a pure stain but he did not believe that it was "absolutely true that the lack of epithelial cells indicates the lack of vaginal fluid." (IH Tr. 31)

When petitioner's expert was asked whether Landrum analyzed the stain in accord with the standards of practice in the serology profession, he responded:

I want to make something clear. I think Mr. Landrum acted in good faith and on his experience as a serologist ... And I think he did the best he could. And he believed that what he stated was correct. My feeling is that he may not have been.

Petitioner's expert said of course he was not saying that Mr. Landrum made any false statements or testified falsely. He did not know whether electrophoretic testing was being performed in Alabama in 1978, and, if not, then Landrum's work was reasonable.

Landrum testified that his examination of the semen stain caused him to determine that it was a pure semen stain, and that is still his opinion. Moreover, it is his expert opinion that even without electrophoretic testing he had a sufficient evidentiary basis for arriving at his conclusion. Although Landrum was familiar with electrophoretic testing, the Alabama Department of Forensic Sciences did not have such testing equipment in 1978. (IH. Tr. 76)

This claim clearly does not involve the failure to produce exculpatory evidence, and petitioner now concedes that there is no basis for any contention that Landrum's testimony was a knowing use of testimony to create a false impression. This Court finds no basis for granting the writ based on this claim relating to Landrum's testimony.

## III. CLAIMS III AND IV: PLAIN ERROR IN PREVIOUSLY DECIDED ISSUES

The Court notes that Claims III and IV of the present petition for writ of habeas have been presented to this Court and to the Eleventh Circuit in a prior petition. *Julius v. Johnson,* 840 F.2d 1533, *as amended,* 854 F.2d 400 (11th Cir.1988). However, since the doctrine of res judicata does not apply to habeas corpus, *Sanders v. United States,* 373 U.S. 1, 8, 83 S.Ct. 1068, 1073, 10 L.Ed.2d 148 (1963), the Court must determine whether the ends of justice

would be served by redetermining these issues in the present proceeding. The burden lies with the petitioner to demonstrate that a reconsideration would serve the ends of justice. *Bass v. Wainwright,* 675 F.2d 1204, 1206 (11th Cir.1982). Although what circumstances would mandate a reconsideration has never been fully catalogued, *see Sanders v. United States,* 373 U.S. at 17, 83 S.Ct. at 1078, the Eleventh Circuit has held that where a legal conclusion reached in a prior habeas proceeding was plainly erroneous, then such a claim requires redetermination. *See, e.g., Raulerson v. Wainwright,* 753 F.2d 869, 874 (11th Cir.1985). In the case at bar, petitioner asserts that the legal conclusions as to the issues of failure to instruct on a lesser included offense and ineffective assistance of counsel were plainly erroneous in that they were based on a mistaken analysis of the underlying facts. For the reasons stated below, this Court finds that the Eleventh Circuit's legal conclusions were not plainly erroneous and therefore that the ends of justice would not be served by the redetermination of the third and fourth claims of the present petition.

### A. *Claim III: Failure to Instruct on a Lesser Included Offense*

Petitioner argues that he was entitled to an instruction on the lesser included offense of manslaughter because the State's evidence as to malice is capable of more than one reasonable inference, one of which is that malice did not exist. In deciding this question the Eleventh Circuit stated: " 'Due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction.' [*Hopper v. Evans,* 456 U.S. 605, 611, 102 S.Ct. 2049, 2052, 72 L.Ed.2d 367 (1981) (emphasis in original).] Julius did not present any evidence suggesting that this crime was a manslaughter, nor did he suggest such a verdict during closing arguments ..." *Julius v. Johnson,* 840 F.2d at 1545. Petitioner contends that he *did* suggest a verdict of manslaughter during closing arguments and that, although he did not personally present evidence of

manslaughter, the State's evidence left such a conclusion open to a reasonable jury.

Whether Julius' counsel argued that proof of malice was absent from the State's evidence is immaterial to the decision in question since, in the paragraph preceding the one containing the alleged "error," the Eleventh Circuit stated: *"Beck v. Alabama* requires the giving of a lesser included offense instruction only where 'there was evidence which, if believed, could reasonably have led to a verdict of a lesser offense.' " *Id.* at 1545. The legal question thus turns on the evidence presented at trial, and not the arguments of defense counsel.

The Eleventh Circuit noted that *Julius* did not present any evidence which would suggest that the crime was manslaughter. Such emphasis on petitioner's failure to produce evidence is clarified by the fact that the court there was addressing the argument that "the circumstances of the crime, without any supporting testimony, could have warranted a manslaughter conviction." *Id.* at 1544. Petitioner again argues that he had no obligation to present evidence to support such a charge since a reasonable jury could infer such a result from the evidence presented by the prosecution. Petitioner asserts that, since the evidence presented might support the reasonable inference of consensual sexual activity, "[o]ne could reasonably have inferred that the attack was the result of provocation even though the particular provocation was unknown." Petition for Writ of Habeas at 49. This Court does not address the case law cited by petitioner to support his renewed argument, since it appears that, as a primary hurdle, there must be evidence submitted at trial to support a charge of a lesser included offense. Petitioner seeks to overcome this hurdle by arguing that, given that the sexual encounter *may* have been consensual, such evidence supports an inference of a lesser included offense. However, even petitioner recognizes that in order to reduce an offense from murder to manslaughter, there must be evidence of "sufficient provocation." Petition for Writ of Habeas at

47, *citing Julius v. State,* 455 So.2d 975, 979 (Ala.Ct.Crim.App.1983). Where, as here, the entire record is devoid of evidence of any provocation, much less "sufficient provocation," the conclusion of the Eleventh Circuit appears to be clearly correct, rather than plainly erroneous. Therefore, the ends of justice do not mandate that this claim be redetermined on the merits.

B. *Claim IV: Ineffective Assistance of Counsel*

Petitioner claims that he was denied the right to effective assistance of counsel because his trial counsel failed to request an instruction limiting the jury's consideration of his 1972 murder conviction in the guilt phase of his trial. The Eleventh Circuit previously held that this failure *did* constitute ineffective assistance of counsel, but that such failure did not prejudice petitioner given the overwhelming, albeit circumstantial, evidence at trial. *Julius v. Johnson,* 840 F.2d at 1541. Given this Court's analysis of all of petitioner's claims up to this point, the conclusion of the Eleventh Circuit appears correct. Therefore, the ends of justice do not mandate a redetermination of this issue.

## IV. CLAIM V: CONSTITUTIONAL ERROR IN JURY INSTRUCTIONS AT SENTENCING PHASE

Petitioner bases his fifth claim on what he characterizes as a "no sympathy" instruction during the sentencing phase of the trial. This claim has not been raised in any previous proceeding. Petitioner argues that this is a classic "new law" claim, in that the claim is based on the law as enunciated in *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) and therefore could not have been brought in any prior proceeding. Assuming, *arguendo,* that this claim is not procedurally barred, this Court declines to grant the writ on this basis.

Petitioner argues that the trial court's instruction at the guilt phase of the trial that "no sympathy, bias or prejudice for any person or individual should enter in your deliberations in rendering a verdict in this case ...," and afterwards the instruc-

tion at the sentencing phase that "I want to again remind you of the charge I gave you earlier concerning the basic law, as far as reasonable doubt and moral certainty are concerned, as well as your functions as jurors ..." offended the Eighth Amendment requirement that a capital sentencer be free to consider any evidence or factor offered by the defendant as a reason for a sentence less than death. Petitioner argues that his sentencer was precluded from considering his mitigating evidence before making its sentencing decision. This Court disagrees.

In evaluating this alleged constitutional error, the Court must determine how a reasonable juror could construe the instruction. *Francis v. Franklin,* 471 U.S. 307, 315–316, 105 S.Ct. 1965, 1971–1972, 85 L.Ed.2d 344 (1985). The Court first notes that the trial court did not repeat its previous instructions as to sympathy, but rather referenced "the basic law, as far as reasonable doubt and moral certainty are concerned," which was contained in the charge in the guilt phase of the case. The reference to sympathy in the guilt phase was clearly an instruction which would benefit an accused. It is illogical to believe that the jurors thought that the reference to sympathy in the guilt phase applied to the sentencing phase, especially given the instructions which followed the reference to which petitioner now objects. The trial court specifically instructed the jury at the sentencing phase that

> ... You can consider the evidence you heard in the guilt phase in considering any aggravating or mitigating circumstances at the present stage of the case. And that is what this hearing is all about, for you to consider and weigh aggravating circumstances and mitigating circumstances against each other in determining what the punishment for the Defendant will be in this case.
>
> You are to consider all relevant evidence, not only as to why the death sentence should be imposed, but to weigh and consider all of the evidence as to why it should not be imposed ...

Record at 303–304. Furthermore, the trial court instructed the jury that

Now, the fact that I list these mitigating circumstances to you does not mean that those are the only mitigating circumstances that you can consider in this case. That is not meant to be an all inclusive of mitigating circumstances. You may find that there are other mitigating circumstances in this case from the evidence you heard and from anything that you may have heard in the evidence about Defendant's character or his life ...

Record at 308. Given these instructions as a whole, this Court finds a reasonable juror could not have construed that the trial court's instruction prohibited the jury at the sentence phase from considering mitigating evidence regarding petitioner's character and background. Therefore, the Court declines to grant the writ on this basis.

### V. CONCLUSION

Having found no merit in petitioner's claims regarding the suppression of *Brady* material, or the use of Landrum's forensic testimony, or the alleged error in the trial court's instructions to the jury at the sentencing phase, and further having found that petitioner's other claims do not merit a redetermination, the Court finds no basis upon which to issue a writ of habeas corpus. Therefore, the petition has been denied.

DONE this 31st day of January, 1989.

/s/ Truman Hobbs
UNITED STATES
DISTRICT JUDGE

In the United States District Court for the Middle District of Alabama

Northern Division

Arthur James Julius, Petitioner

vs.

Charles E. Jones, Warden, etc., Respondent

Civil Action No. 89-H-84-N.

### ORDER

Pursuant to respondent's request for clarification or modification of this Court's Memorandum Opinion entered January 31, 1989, and for good cause shown, said request is GRANTED. This Court hereby VACATES Part I.E. of its opinion. Petitioner did not present the issue contained in Part I.E. to the Court in his petition for writ of habeas corpus, and therefore said issue was not properly before the Court.

The Court mistakenly considered this issue due to the numerous documents previously filed with the Court in this cause. Said documents erroneously stated that the inventory list indicated that the money in question came from the victim's house. However, in the testimony presented to Judge Gordon on January 21, 1989, it was shown that the money included on the inventory list had been taken from petitioner. In light of this testimony, it appears that petitioner correctly concluded that the claim should be dropped.

DONE and ORDERED this 2nd day of February, 1989.

/s/ Truman Hobbs
UNITED STATES
DISTRICT JUDGE