576 So.2d 236 (1990)
Andy Dwight PIERCE
v.
STATE.
4 Div. 406.
Court of Criminal Appeals of Alabama.
August 3, 1990.
Rehearing Denied September 21, 1990.
*238 W. Phil Etheridge, Hartford, for appellant.
Don Siegelman, Atty. Gen., and William D. Little and Beth Jackson Hughes, Asst. Attys. Gen., for appellee.
TYSON, Judge.
Andy Dwight Pierce was indicted for intentional murder during the course of a robbery, in violation of § 13A-5-40(a)(2), Code of Alabama 1975. The jury found the appellant guilty of the capital offense as charged in the indictment and recommended the death penalty by a vote of ten to two. The trial judge accepted the jury's recommendation, and the appellant was sentenced to death.
Nancy Miller testified that her mother, Annie Ruth Brooks, the victim in this case, lived at 109 South Commerce Street in Geneva, Alabama, in early May 1988. At the time, the victim owned a 1987 Buick LaSabre automobile. Miller stated that her mother always kept between $25 and $50 in cash on her person. During the month of April 1988, the victim wrote three checks for cash: (1) on April 1, in the amount of $100; (2) on April 13, in the amount of $100; (3) on April 26, in the amount of $75. On April 29, 1988, the victim wrote a check to the Piggly Wiggly grocery store in the *239 amount of $50, and she received cash in the amount of $46.34 in return.
John Juhnke testified that on May 2, 1988, he and the appellant went over to the victim's house to trim some hedges in her yard. At some point, Juhnke left the appellant's house to check on some insurance matters. When he returned, he helped the appellant carry the hedge trimmings out to the street. When they finished, the appellant went inside the victim's house while Juhnke waited outside. In a few minutes, the appellant came outside and said that the victim had given him $10. The appellant then gave Juhnke $5 and told him that the victim wanted him to do some plumbing work for her. The appellant told Juhnke to go on home and tell the appellant's girlfriend, Linda Powell, that he would be home soon. Juhnke, who lived next door to the appellant, went home. He stated that he did not see any vehicles other than the victim's car when he left the victim's house. Later that night, Powell woke up Juhnke and asked him to show her where the victim lived. Juhnke then took Powell to the victim's house. Powell knocked on the front door and Juhnke went around to the back door. Juhnke noticed that the victim's car was gone but that some lights and the television were on in the house. Powell then went inside the victim's house. When she came out, the two went home.
Several witnesses who were neighbors of the victim testified that they saw the appellant and Juhnke working in the victim's yard on the afternoon in question. However, none of these witnesses saw any vehicles, other than the victim's car, parked at the victim's house that afternoon.
D.D. McDaniels testified that on May 2, 1988, he was employed by ALFA Insurance and his office was located at 300 Commerce Street in Geneva, Alabama. On that day, Juhnke came to his office about 5:15 p.m. and talked to him about some insurance matters. Juhnke stayed about 10 minutes.
Greg Ward, a deputy with the Geneva County sheriff's department, testified that he was at the Chicken Box in Geneva on the night of May 2, 1988, when Linda Powell approached him and stated that she had found a person dead. Powell then took Ward to the victim's house on 109 Commerce Street and showed him the victim's body. After talking to Powell and Juhnke, a BOLO (be on the lookout) was issued for the 1987 Buick LaSabre which belonged to the victim.
Charles Brooks, an analyst for the Department of Forensic Sciences, stated that he found the victim's body on a bed in one of the bedrooms of the house. The victim had a ligature around her left wrist and a gag in her mouth. Nearby, a 10 pound traction weight was found on the floor. Hairs and blood similar to the victim's were found on the traction weight. The autopsy revealed that the victim's cause of death was a massive injury to the right side of the victim's head that shattered the skull. The victim's injury would be consistent with being hit by the traction weight. The victim also suffered a bruise on the left side of the neck and a break in the hyoid bone which would be consistent with attempted strangulation. The victim's wallet was found lying open on the kitchen table.
Nathan Pierce, the appellant's brother, testified that the appellant arrived at his house in Kinston, Alabama, at approximately 6:30 on the afternoon in question. The appellant was driving a gray Buick, and he told Nathan that the woman he worked for had loaned him the car. The appellant and Nathan then stopped by Tony and Leigh Pritchard's house in Kinston. When Leigh Pritchard asked the appellant where he had gotten the car, the appellant asked her if she wanted to buy it for $5. The appellant and Nathan then left the Pritchards' house and went to Tina Harrison's house in Opp, Alabama. When Tina Harrison inquired about the car, the appellant told her it belonged to his "boss lady."
Around 11:00 on the night of May 2, 1988, Eddie Harrison saw the appellant and Nathan at the Depot Lounge in Opp. The three drank some beer and then rode around Opp for a while in the victim's car. At some point, the appellant passed out in the car, and the three returned to the Depot Lounge. While Nathan was inside the Depot Lounge, one of his and the appellant's *240 other brothers, Dickie, came into the lounge and told Nathan that the victim had been found dead and that the police were looking for the appellant. Nathan told Dickie that he did not know where the appellant was. Dickie left, and Nathan then went out to the car and asked the appellant what had happened. The appellant told him the same story that he later told the police. The appellant then took Nathan home around 3:00 a.m. on May 3, 1988.
During the early morning hours of May 3, 1988, Thomas Weeks of the Coffee County sheriff's department received information that the appellant was wanted for questioning in Geneva County, and he began looking for the appellant in the Kinston area where the appellant and his family had lived. Sometime after daylight, Weeks and Jack Hubbard, an investigator, drove past the appellant's home and saw the appellant standing near a bridge. Weeks stopped the car and started talking to the appellant. The appellant identified himself as his brother, Danny Pierce, and said that he was checking some fishing lines under the bridge. Weeks and Hubbard then drove away. A few minutes later, Weeks realized that he had been talking to the appellant and not Danny. Weeks turned around and went back to the bridge where they had seen the appellant, but he had disappeared into the woods. A short time later, the appellant's mother and Nathan drove up. Nathan went into the woods and talked to the appellant. The appellant came out of the woods a short time later and was arrested and advised of his Miranda rights.
Weeks and Hubbard then transported the appellant to the Kinston Police Department. During the trip, the appellant stated that while he was doing some yard work for the victim, an older man was in the victim's house doing some plumbing work for the victim. The appellant said that he thought he heard the man and the victim arguing and that he did hear some scuffling noises inside the house. The appellant stated that, at some point, the man came out of the house and threw some car keys at him and told him that he better get out of there. The appellant alleged that the man was driving an older model pickup truck and had parked the truck near the curb. The appellant said that he then left in the victim's Buick LaSabre and drove it to Opp where he parked it at the Four Sons Lounge and left the keys in the car.
Deputy Ward and Geneva County Sheriff Doug Whittle picked up the appellant at the Kinston Police Department at 11:30 a.m. on May 3, 1988 and transported him back to Geneva. When the appellant was placed in the patrol car, he was again advised of his Miranda rights. The appellant stated that he knew his rights and knew the law. Sheriff Whittle asked the appellant where the victim's car was, and the appellant replied that he had left it at the Four Sons. The appellant then stated that while he and Juhnke were doing some yard work for the victim, Juhnke left to check on some insurance matters. During this time, a man named Jim, who was driving a 1963 blue Chevrolet truck, pulled up in front of the victim's house and parked his truck on the street. Jim told the appellant that he was going to do some plumbing work for the victim, and then he went inside the victim's house. The appellant said that he heard Jim and the victim arguing. He said that when the appellant and Juhnke finished working, the appellant went to the victim's back porch, at which time Jim came outside, pointed a gun at him, and told him to come inside the house. After the appellant went inside, Jim gave him some money and told him to go pay Juhnke and tell him to go home. The appellant did this and then went back inside the victim's house and Jim told him to lay on the floor, and he threw him some car keys and told him to take the victim's car and leave. The appellant said he then left in the victim's car and went to his brother's house. The two drove to Opp and left the victim's car at the Four Sons Lounge.
Later that day, Sheriff Whittle received information that the victim's car had been found in the Pea River about five miles from where the appellant was arrested. When he told the appellant this information, the appellant admitted that he ran the *241 victim's car into the river. A match book from the Depot Lounge in Opp was found in the victim's car as was a $5 bill, a partially smoked cigarette and two empty beer cans.
The appellant's testimony was basically the same as the statement which he gave to the police. However, at trial, the appellant stated that Jim had threatened to harm his son if he didn't take the victim's car and leave. The appellant also testified that he ran the victim's car into the river because he was afraid that he would be blamed for the victim's murder, which he did not commit.

I
As far as this court can ascertain from the record, there were 88 prospective jurors on the venire, 6 of whom were black. Of those 88, 20 were excused or removed for cause (2 of these 20 venire members were black). This left 68 remaining jurors on the venire list, 4 of whom were black. The State used three of its peremptory strikes to remove three of these four blacks from the venire. The defense used one of its peremptory strikes to remove the remaining black from the jury venire. The appellant, who is white (as was the victim), makes several claims with regard to the State's use of its peremptory strikes to remove blacks from the jury venire and the composition of the jury venire as a whole.
At trial, the appellant challenged the, composition of the jury venire on the grounds that it did not represent a fair cross section of the community (R. 898). He argued that the black population of the community (Geneva County) was 13% while blacks made up only 5% of the members of this jury venire. The State responded that the jury venire list "was compiled from Montgomery in a random selection by a computer of people that hold a driver's license that live in Geneva County or an identification card issued by the Department of Public Safety." (R. 899) The trial judge denied the appellant's challenge to the venire on these grounds.
On appeal, the appellant asserts this claim under the Sixth Amendment to the United States Constitution and § 12-16-55, Code of Alabama 1975.[1]
"In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."
Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).
The appellant has the burden of establishing a prima facie case of a "fair cross section" violation. Rayburn v. State, 495 So.2d 733 (Ala.Crim.App.1986). Here, the appellant has failed to meet this burden. The mere recitation of the percentage disparity between the population of blacks in Geneva County and the number of blacks on the jury venire is not sufficient in this instance to allow us to conclude that blacks were not fairly represented on this jury venire in relation to the black population in the community.
Furthermore, even if the appellant had demonstrated that blacks were underrepresented on the jury venire, he failed to show that this was due to the systematic exclusion of blacks in the selection process of the jury venire list. This court has expressly approved the use of drivers' licenses or identification cards for compiling master jury lists. See Rayburn; Vaughn v. State, 485 So.2d 388 (Ala.Crim.App. 1986). The appellant presented no evidence that this procedure systematically excluded blacks from the jury venire list. "The United States Constitution `does not require an exact proportion between the percentage of blacks in the population and *242 those on the jury list. What is required is that no qualified person can be excluded from jury service." Jackson v. State, 549 So.2d 616, 619 (Ala.Crim.App.1989).
The appellant also argues that the State's use of its peremptory strikes deprived him of "the Sixth Amendment guarantee to a jury drawn from a fair cross-section of the community." (Appellant's brief, p. 7) "We reject petitioner's fundamental thesis that a prosecutor's use of peremptory challenges to eliminate a distinctive group in the community deprives the defendant of a Sixth Amendment right to the `fair possibility' of a representative jury." Holland v. Illinois, 493 U.S. 474, 110 S.Ct. 803, 806, 107 L.Ed.2d 905 (1990). See also Kuenzel v. State, 577 So.2d 474 (Ala.Crim. App.1990). The "fair cross section" requirement guaranteed by the Sixth Amendment insures an impartial trial, not a representative one. Holland.
The appellant further contends that the State used its peremptory stikes to remove blacks from the jury panel in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution, the United States Supreme Court's decision in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, (1986); Article I, Section 6 of the Alabama Constitution; and § 12-16-55, Code of Alabama 1975.
Under this Court's decision in Gordon v. State, [Ms. 8 Div. 496, May 25, 1990] (Ala. Crim.App.1990) (citing Bankhead v. State, [Ms. 6 Div. 370, September 29, 1989] (Ala. Crim.App.1989), Smith v. State, 515 So.2d 149 (Ala.Crim.App.1987), and Bui v. State, 551 So.2d 1094 (Ala.Crim.App.1988), aff'd, 551 So.2d 1125 (Ala.1989), cert. filed with United States Supreme Court, (No. 89-6271, December 12, 1989)), the appellant, who is a member of the white race, does not have standing to assert a claim, under the Equal Protection Clause, that the State improperly use its peremptory strikes to remove blacks from his jury.[2]
We note that this particular claim was not asserted at trial. Nevertheless, we are required to notice any plain error under Rule 45A, A.R.A.P. However, even if we had found that the appellant had standing to raise this issue before this court, the appellant would still be required to have established a prima facie case.
In order to establish a prima facie case of purposeful discrimination in the selection of the petit jury based solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial, the defendant "first must show that he is a member of a cognizable racial group, ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race."
Kuenzel, at p. 485-86 (quoting Batson, 476 U.S. at 96, 106 S.Ct. at 1723.).
Under the circumstances of this case, we cannot conclude that a prima facie case of purposeful discrimination has been established. Kuenzel; Ex Parte Watkins, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). This issue is without merit.

II
The appellant contends that prospective juror Eunice Adkison demonstrated a fixed opinion as to his guilt during voir dire examination. Thus, he asserts that the trial judge erroneously denied his challenge for cause as to this potential juror. The following excerpt from the record is pertinent to our discussion of this issue:
*243 "MR. ELDRIDGE: Mrs. Adkison, I had asked you out there and I think you fairly well answered it out there for me, but I want to ask you again for the Record. You told me that in this particular case that you thought Andy Pierce was guilty. Is that true?
"MRS. ADKISON: Well, I feel like he is.
"MR. ELDRIDGE: And, you told me that was a view that you felt strongly about out there, is that correct?
"MRS. ADKISON: Yes.
"MR. ELDRIDGE: And, that it would be hard for someone to convince youto change that view, is that correct?
"MRS. ADKISON: I might could be swayed by hearing more evidence and so forth but, as of right now, I think it would be hard to do.
"MR. ELDRIDGE: Would that be a view that you would take with you to the jury box?
"MRS. ADKISON: Yes.
"MR. ELDRIDGE: It would also be hard and difficult to bare [sic], is that correct?
"MRS. ADKISON: I think it would be.
"MR. EMERY: Mrs. Adkison, do you understand that the basic proposition of criminal law is that a Defendant is presumed innocent until he is proven guilty beyond a reasonable doubt in Court?
"MRS. ADKISON: Yes.
"MR. EMERY: Do you believe that is a good law?
"MRS. ADKISON: Yes, I believe it is.
"MR. EMERY: The Judge will instruct you to follow that law and to presume that the Defendant is not guilty until you are convinced by legal evidence presented in this Courthouse that he is guilty. So you understand that?
"MRS. ADKISON: Yes.
"MR. EMERY: Can you do that if the Judge tells you to presume he is innocent and to follow the law and to consider the evidence and make your decision at the end of the case?
"MRS. ADKISON: I believe it's possible he is not guilty.
"MR. EMERY: Do you have a fixed opinion as to his guilt or innocence that can not be changed?
"MRS. ADKISON: I think it might could be changed. All I know is what I've read in papers.
"MR. EMERY: You did not have any personal knowledge?
"MRS. ADKISON: No.
"MR. EMERY: Do you believe everything you read in the newspapers?
"MRS. ADKISON: No.
"MR. EMERY: Has anybody in the newspapers said that he was guilty?
"MRS. ADKISON: I don't recall reading that they have or haven't.
"MR. EMERY: Do you have any particular prejudice against the Defendant?
"MRS. ADKISON: No.
"MR. EMERY: Do you think you can follow the Court's instructions to you and do what the Judge instructs you to do?
"MRS. ADKISON: Well, I think I can.
"MR. EMERY: You were asked a couple of questions out there in the Courtroom that required you to assume that the Defendant was found guilty. I don't want to confuse that with what we're talking about now with what happened out there. Can you assume as you are required by law that the Defendant is not guilty until he is proven guilty by legal evidence beyond a reasonable doubt? Can you do that?
"MRS. ADKISON: Yes.
"MR. EMERY: Thank you. That's all I have to ask.
"MR. ELDRIDGE: Mrs. Adkison, let me ask you something. There is nothing wrong with your view or your opinion, but we just want to make sure what it is. Are you saying that Andy Dwight Pierce would have to present evidence to you that he was not guilty before you would change your mind?
"MRS. ADKISON: Yes.
"MR. ELDRIDGE: No further questions.
*244 "MR. EMERY: Mrs. Adkison, the law requires that you presume him not guilty at this point. Can you do that?
"MRS. ADKISON: Yes, I think I can.
"MR. EMERY: And, can you hold that view that he is not guilty until the evidence convinces you otherwise?
"MRS. ADKISON: Yes.
"MR. EMERY: In other words, can you base your decision in this case solely on the evidence that you hear in the Courtroom and put aside any opinions or notions that you may have at this time?
"MRS. ADKISON: Yes, I believe I can.
"MR. EMERY: And, you can listen to the evidence and base a final verdict in this case only on the evidence?
"MRS. ADKISON: Yes.
"MR. EMERY: Can you put out of your mind any thing you may have heard in the newspaper?
"MRS. ADKISON: Yes.
"MR. EMERY: Can you come into this trial with an open mind?
"MRS. ADKISON: Yes.
"MR. EMERY: Thank you.
"THE COURT: If you are selected to serve on the jury and sit in the jury box, can you listen to the evidence that's presented in Court and the instructions that are given to you by the Court as to what the law is and apply the law to the facts and render a verdict based on the law and the facts, or is your opinion such and your feelings such that your mind is closed and you could not do that?
"MRS. ADKISON: No, I don't believe my mind is closed to that.
"THE COURT: Thank you. You may go back and have a seat in the jury box.
"MR. ELDRIDGE: Judge, we have objections on the 6th, 8th, and 14th Amendments to the United States Constitution and the Alabama Constitution and the fact that my client is entitled to a fair and impartial trial by an impartial jury. The Court's questions to my jurors were totally different than the questions which were asked of the ones who said they could not impose the death penalty. Under the decisions rendered by the United States Supreme Court, it should be basically the same question in reverse fashion. It indicated to the juror that the decision the Court wanted was the answer of yes, that she could do that. We object on those grounds and we do challenge her for cause.
"THE COURT: Let the Record show the Court bases it's opinion on whether to grant the challenge or not based on all of the questions to the juror and observing the juror's demeanor and to the questions that the Court has asked, but not just on the one question that the Court asked but in observing all questions either in here or on the general voir dire." (R. 648-654.)
"Section 12-16-150, Code of Alabama 1975, provides that, when a juror `has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict,' a challenge for cause is proper. Nobis v. State, 401 So.2d 191 (Ala.Crim.App.), cert. denied, 401 So.2d 204 (Ala.1981). The juror must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused. The juror's opinion must be fixed to the point that it would bias the verdict which the juror would be required to render. Johnson v. State, 356 So.2d 769 (Ala. Crim.App.1978); McCorvey v. State, 339 So.2d 1053 (Ala.Crim.App.), cert. denied, 339 So.2d 1058 (Ala.1976); Tidmore v. City of Birmingham, 356 So.2d 231 (Ala.Crim. App.1977), cert. denied, 356 So.2d 234." Thomas v. State, 539 So.2d 375, 380 (Ala. Crim.App.), aff'd, 539 So.2d 399 (Ala.1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989).
Adkison stated that she felt that the appellant was guilty and that it might be hard to change her mind and that the appellant would have to present evidence to change her mind. However, Adkison also testified that it was possible that the appellant was not guilty and that her view was not fixed. She said that she understood that the appellant was presumed innocent and that she could listen to the evidence presented at trial with an open mind and base her decision on this evidence and follow the trial court's instructions. Our review *245 of Adkison's testimony does not reveal that she had a fixed opinion as to the appellant's guilt so as to bias her verdict. Thus, we conclude that the trial judge did not abuse his discretion by denying the appellant's challenge for cause as to prospective juror Adkison. As the trial judge correctly observed, he was in the best position to determine whether Adkison was biased. See Thomas.

III
The appellant argues that the trial judge erred by refusing to grant his challenges for cause as to 12 prospective jurors (E. Adkison, J. Adkison, Arnold, Crawford, Brooks, Brunson, Butler, Casey, Davis, Keller, D. Miller, E. Miller) who stated that they would automatically vote for the death penalty. Nine of these prospective jurors were questioned together in the first voir dire panel. Each of these jurors (E. Adkison, J. Adkison, Arnold, Crawford, Brooks, Brunson, Butler, Casey, Davis) responded individually that they strongly favored the death penalty and would automatically vote for the death penalty (R. 593-95, 614-15, 602-03, 591-99, 604-05, 607-08, 610-11, 596-98, 600-02, 587-88). Later, however, the prosecutor explained to this voir dire panel that the judge would give them certain instructions concerning their role during the sentencing phase of the trial, and he told them that they were required to follow the trial judge's instructions. The following comments to these prospective jurors were then made by the prosecutor:
"MR. EMERY: You are asked a series of questions, some of you were, that in certain circumstances that you would automatically give somebody the electric chair. I have tried to explain to you that the law does not allow you to automatically give somebody the electric chair. It's a thought process where you consider all the circumstances and it's not automatically that if you kill somebody else that you must die. The law is not that simple.
"However, are there any of you that could not follow the law as the Judge instructs you as to how you should deliberate about the death penalty?

"JURORS: (No response)
"MR. EMERY: Are there any of you that are so opinionated that you would give somebody the electric chair no matter what the Judge instructs you to do because you just think they are going to get the electric chair and that's it?
"JURORS: (No response)
"MR. EMERY: Are there any of you that can't follow the law on this matter?

"JURORS: (No response)
"MR. EMERY: I take it that you can allat this time, you all believe you could follow the instructions that the Court gives on this matter?

"JURORS: (No response)" (R. 632-33.)
After further questioning of the voir dire panel by the prosecutor, defense counsel requested that he be allowed to additionally question the nine prospective jurors named above and the trial judge agreed. Four of these prospective jurors specifically stated that they could follow the court's instructions on this matter (R. 656-58, 669, 672-74, 679, 683-84). A fifth juror, E. Adkison, was questioned concerning her feelings about the appellant's guilt; however, she was never asked any more questions about her feelings concerning the death penalty (R. 647-53). The record reveals that the other four jurors were not further questioned concerning their feelings about the death penalty.
The other three jurors which the appellant contends should have been excused based on their feelings concerning the death penalty clearly indicated that they could consider all the evidence presented at the sentencing hearing and could follow the trial court's instructions (R. 832, 836, 838).
"A venire member who believes that the death penalty should automatically be imposed in every capital case should be excused. Bracewell v. State, 506 So.2d 354, 358 (Ala.Crim.App.1986). Persons who favor the death penalty should not be excused for cause where they indicate they will follow the court's instructions.

*246 Hance v. Zant, 696 F.2d 940, 956 (11th Cir.), cert. denied, 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983)."
Martin v. State, 548 So.2d 488, 491 (Ala. Crim.App.1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, ___ U.S. ___, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). See Kuenzel.
We find that the trial judge properly denied defense counsel's challenges as to each of these twelve jurors.

IV
The appellant asserts that the evidence was insufficient to support his capital murder conviction because the State failed to prove that he committed a murder during the course of a robbery as required by § 13A-5-40(a)(2), Code of Alabama 1975. The indictment in this case reads as follows:
"The Grand Jury of said County Charge that, before the finding of this Indictment on or about May 2, 1988, ANDY DWIGHT PIERCE did intentionally cause the death of Annie Ruth Brooks by beating her about the head with a dangerous instrument, to-wit: a heavy metal traction weight, and ANDY DWIGHT PIERCE caused said death during the time that ANDY DWIGHT PIERCE was in the course of committing or attempting to commit a theft of a 1987 Buick LaSabre, (gun metal grey in color), and/or United States Currency, the property of Annie Ruth Brooks, by the use of force against the person of Annie Ruth Brooks, with intent to overcome her physical power of resistance while the said ANDY DWIGHT PIERCE was armed with a dangerous instrument, to-wit: a heavy metal traction weight, in violation of Section 13A-5-40(a)(2) of the Code of Alabama, 1975, against the peace and dignity of the State of Alabama." (R. 48.)
The appellant contends that the State did not prove that the victim's murder occurred while the appellant was in the course of committing or attempting to commit a robbery because the theft of the victim's automobile was "a mere afterthought" and there was no proof that the appellant took any money from the victim's wallet.
"As the Alabama Supreme Court held in Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962), `the fact that the victim was dead at the time the property was taken would not militate the crime of robbery if the intervening time between the murder and the taking formed a continuous chain of events.' Clements v. State, 370 So.2d 708, 713 (Ala.Cr.App. 1978), affirmed in pertinent part, 370 So.2d 723 (Ala.1979); Clark v. State, 451 So.2d 368, 372 (Ala.Cr.App.1984). To sustain any other position `would be tantamount to granting to would-be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecutoion under the capital felony statute.' Thomas v. State, 460 So.2d 207, 212 (Ala.Cr.App.1983), affirmed, 460 So.2d 216 (Ala.1984).
"Although a robbery committed as a `mere afterthought' and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of murder-robbery, see Bufford v. State, supra, O'Pry v. State, [642 S.W.2d 748 (Tex.Cr.App.1981) ], supra, the question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. Crowe v. State, 435 So.2d 1371, 1379 (Ala.Cr.App. 1983). The jury may infer from the facts and cirmcumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim's property and fled. Cobern v. State, 273 Ala. 547, 550, 142 So.2d 869 (1962); Crowe v. State, 435 So.2d 1371 (Ala.Cr.App.1983); Bufford v. State, 382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala.1980); Clements v. State, 370 So.2d 708 (Ala.Cr.App.1978), affirmed in pertinent part, 370 So.2d 723 (Ala.1979)."
Connolly v. State, 500 So.2d 57 (Ala.Crim. App.1985), aff'd, 500 So.2d 68 (Ala.1986).
"The capital crime of robbery when the victim is intentionally killed is a single offense beginning with the act of robbing or attempting to rob and culminating *247 in the act of intentionally killing the victim; the offense consists of two elements, robbing and intentional killing. Davis v. State, 536 So.2d 110 (Ala.Cr. App.1987); Magwood v. State, 494 So.2d 124 (Ala.Cr.App.1985), aff'd, Ex Parte Magwood, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). The intentional murder must occur during the course of the robbery in question; however, the taking of the property of the victim need not occur prior to the killing. Clark v. State, 451 So.2d 368 (Ala.Cr.App.), cert. denied, 451 So.2d 369 (Ala.1984). While the violence or intimidation must precede or be concomitant with the taking, it is immaterial that the victim is dead when the theft occurs. Thomas v. State, 460 So.2d 207 (Ala.Cr.App.1983), aff'd, 460 So.2d 216 (Ala.1984)."
Hallford v. State, 548 So.2d 526, 534 (Ala. Crim.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, ___ U.S. ___, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).
We find that there was sufficient evidence presented by the State from which the jury could have inferred that the victim's murder occurred during the course of a robbery. There was certainly evidence which would allow the jury to conclude that the murder of the victim and the taking of her car formed a continuous chain of events, and thus the robbery of the victim was not a mere afterthought. Hooks v. State, 534 So.2d 329 (Ala.Crim.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989); Hallford. There was no doubt that the appellant took the victim's automobile that day. Whether the appellant intended to rob the victim of her automobile when he killed her was a question for the jury. Siebert v. State, 562 So.2d 586 (Ala.Crim.App.), aff'd, 562 So.2d 600 (Ala.1990).
Furthermore, we believe that the State established sufficient proof that the appellant intended to rob the victim of any money she may have had in her wallet when he killed her. There was testimony that the victim habitually kept $25-50 cash on her person and that she had cashed a check for greater than the amount of her purchase just days before her death. Her wallet was found lying open on the kitchen table when her body was found. The appellant had cash on him on the night in question. The fact that there was no testimony that the victim's wallet was empty when it was found is irrelevant. There is no requirement that the State prove an actual taking of property by the appellant to establish the offense of robbery. An attempted theft was sufficient. Tarver v. State, 500 So.2d 1232 (Ala.Crim.App.), aff'd, 500 So.2d 1256 (Ala.1986) aff'd, 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987); Kuenzel. Thus, we find there was sufficient evidence to sustain the appellant's conviction for the capital offense of murder during the course of a robbery. See also Henderson v. State, [Ms. 7 Div. 68, July 24, 1990] (Ala.Crim.App.1990).

V
The following excerpt from the record occurred during the prosecutor's closing argument during the guilt phase of the trial:
"MR. EMERY: Ladies and Gentlemen of the Jury, on May 2nd, 1988, here in Geneva, there existed what I would call an idealistic scene. It was ideal in what we consider life in a small town in south Alabama. Right here in Geneva, just a few blocks from where we are at this very moment, lived Annie Ruth Brooks, a sixty-nine-year old lady that was enjoying her sixty-ninth spring in lower Alabama. It was a day not too unlike today, I'm sure.
"Around her house, the shrubs and the trees were coming to life and the life was stirring in her that we all feel in the spring, spring cleaning, getting every thing in order, and what life is all about and what we all enjoy.
"But, down the street, there was coming an evil storm, a cloud of evilness that had been brewing for years and years. Brewing inside the head of this man right here. (Pointing to the Defendant)

*248 "It had been brewing for years to the point where it had distorted his life and the way that he looked at life and it prevented him from trusting other people and prevented him from being honest and prevented him from caring about other people. It prevented him from enjoying life as we do.
"Instead, inside his soul was evilness. The evilness was fueled by alcohol, stealing, and lying to the point where life was completely distorted for him and he had no respect for others. More importantly in this case, he didn't believe in himself and had no confidence or respect for other people and thinks that everyone is a fool and will believe anything he says. He has a completely distorted view of life.
"He was coming down Campbell Street and no one could see it because it was in between his skull. He was coming down the street with honest and simple Mr. Juhnke to do some yard work who was just trying to help Mrs. Brooks enjoy the spring season.
"....
"He ran to the home where maybe he used to run out in the woods to hide in to feel secure when he was a child, just like when a rabbit gets scared up, they start running in circles and they end up right back where they started from.
"He doesn't go back to where he has been living with this girl. He tried to tell you that he was so concerned about his child and this woman, but he didn't mind leaving them. He was getting out of town. Then, he comes into this courtroom and he tells you that he's really trying to help the police the whole time.
"But, to get back to what I said originally about having an evil soul and how it distorts his prospective and how he thinks that he can tell you things like this and you will believe it, how he thinks he can lie to all his friends and his brothers and that people will believe him, because his mind has been distorted and he doesn't understand that people can recognize the truth and they can recognize a lie.
"When you came into this courtroom, you brought that knowledge and that ability with you. Some people call it common sense and some people call it having a prospective or an understanding of life. You may not have thought about it, but you knew when you came into this courtroom that people lie. The reason people liewell, there is really two reasons and one is obvious and comes to the mind immediately, and that is that they don't want you to know the truth. They have something to hide, so they lie.
"The second reason is just as obvious, even though you may not think of it right away, and that is that they think that you can't tell that they are lying. They think they can trick those persons. People don't lie thinking that they're going to get caught in their lie. People lie to cover up the truth so that people will not understand what really happened.
"....
"What he has forgotten is that when someone is telling the truth, a Jury can see it. What he has forgotten is that the truth is like a bell that rings. It is clear, it is precise, and everybody recognizes it. Then, when you ring the bell the second time, it sounds the same. It's not distorted and it's not confused and it doesn't change. It's always the truth and always clear.
"But, he thinks he can get up here and clatter in front of you and it's going to ring like the truth. The reason he thinks that is this distortion that's in his mind and this evilness that's been brewing in his head for years. He expects you to believe him over everyone else. Never mind that he had ten prior felonies that he has committedthat he's been convicted of, he's been convicted of three prior robberies, five larcenies, a burglary, and buying and receiving stolen property.
"He thinks in his twisted mind that when he gets up on this witness stand that he is going to sound believable.
"You people do not look through that same evil cloud. You came into this courtroom with a clear vision as a citizen of this City or this County. You can *249 recognize the truth and you can recognize it because you have good sense. What he is trying to pull over on you does not make sense. It is not logical. It is absurd to think that what he is trying to say happened, really happened. It's not logical to think that a man named Jim introduced himself to him and made him do all of this somehow. It's preposterous. It doesn't make sense. But, to his evil way of looking at things and in his distorted eyes, he assumes that you have the same distorted view and that you will believe him.
"His brother didn't believe him and nobody else believes him. Ladies and Gentlemen, you're not going to believe him and you don't believe it now.
"What you must do is to do something about this evilness.

"It's springtime again and it's time to clear the air and it's time to freshen up Geneva County. We need to blow this evilness out of this County. What I'm speaking of is to find him guilty of exactly what he did. Then, we can sweep this evilness out of this County and this County and this City will be a better place for all of us. Then, someday down here on 109 Commerce Street, somebody can move into that house and enjoy the spring. Thank you." (R. 1464-77).
The appellant asserts that the prosecutor's references to him during argument as evil was an improper attack on his character. As can be seen from the quoted portion of the record above, no objections were made to the prosecutor's argument.
"Thus, this issue was not preserved at trial. However, appellant's failure to preserve this issue, `while weighing against defendant as to any possible claim of prejudice, serves as no impedimant to our scope of review pursuant to the "plain error" mandate in death penalty cases.' Ex Parte Bush, 431 So.2d 563, 565 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983). Therefore, we must now consider whether the prosecutor's remarks constituted `plain error.' Our Supreme Court has adopted federal case law defining plain error, holding that `[p]lain error only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.' Ex Parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). It is only where a particularly egregious error occurs at trial that the plain error standard is applied. Ex Parte Harrell, 470 So.2d 1309, 1313 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). We have applied this standard to prosecutorial argument. Murry v. State, 562 So.2d 1348, 1353, 1354 (Ala. Crim.App.1988).
"Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Cr.App. 1978), and that court is given broad discretion in determining what is permissible argument. Hurst v. State, 397 So.2d 203, 208 (Ala.Cr.App.), cert. denied, 397 So.2d 208 (Ala.1981). Moreover, this Court has stated that it will not reverse unless there has been an abuse of that discretion. Miller v. State, 431 So.2d 586, 591 (Ala.Cr.App.1983).
"Whatever is in evidence is considered subject to legitimate comment by counsel. Ward v. State, 440 So.2d 1227, 1230 (Ala.Cr.App.1983); Spears v. State, 402 So.2d 1073, 1076 (Ala.Cr.App.), cert. denied, 402 So.2d 1078 (Ala.1981); Watson v. State, 398 So.2d 320, 328 (Ala.Cr.App.1980), cert. denied, 398 So.2d 332 (Ala.1981), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981). The prosecutor, like defense counsel, has the right to present his impressions from the evidence, and he may argue every matter of legitimate inference and may examine, collate, sift, and treat evidence in his own way. Sanders v. State, 423 So.2d 348, 352 (Ala.Cr.App.1982)."
Bankhead v. State, [Ms. 6 Div. 370, September 29, 1989] (Ala.Crim.App.1989).
Therefore, even assuming that the prosecutor's remarks were a characterization of the appellant as an "evil person," we believe *250 it was a characterization which was certainly supported by the evidence. While we do not condone characterizations such as this, the law is clear that "[i]n a proper case, the prosecuting attorney may characterize the accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence of the case." Nicks v. State, 521 So.2d 1018, 1023 (Ala.Crim.App.1987); aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988).
"Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict."
Bankhead, at p. 21.
The prosector's references to the evilness of this appellant during closing argument do not constitute "plain error."

VI
The following occurred during the re-direct examination of Deputy Ward:
"Q. You were asked about putting a BOLO out on a '63 Chevrolet truck by the lawyer here. Did you go talk to Mr. Juhnke who was the other witness that was there earlier that day?
"A. Yes.
"Q. Did you talk to the neighbors about seeing this truck?
"A. I talked to John Juhnke. He's the only one I talked to about the truck.
"Q. Did other officers interview people along the street?
"A. Yes.
"Q. Did you interview witnesses driving up and down the street?
"A. The other officers did and they would come back to me and tell me what they found out.
"Q. Has anybody been able to find out any thing about anybody seeing a truck?
"A. From all the witnesses that we talked to, there was never a truck seen by anybody or
"MR. ELDRIDGE: We object.
"THE COURT: I overrule.
"MR. EMERY: Did anybody see another person there or another man there?
"A. All the witnesses we talked to saw nobody else but Andy Pierce and John Juhnke." (R. 1242-43.)
The appellant contends that Ward's testimony as quoted above was hearsay and that it should have been excluded. We do not find that Ward's testimony constituted hearsay testimony. "Hearsay involves an out of court statement offered to prove the truth of the matter stated.... [U]tterences offered for some purpose other than to prove the truth of the out of court declaration fall outside the rule." Ex Parte Bryars, 456 So.2d 1136, 1138 (Ala.Crim. App.1984). "Thus, a statement may be admissible where it is not offered to prove the truth of whatever facts might be stated, `but rather to establish the reason for action or conduct by the witness.'" Edwards v. State, 502 So.2d 846, 849 (Ala. Crim.App.1986).
Here, Ward's testimony was not offered to show that the witnesses whom the police had interviewed told the police that they had not seen this particular truck parked in front of the victim's house on the day in question. In fact, several of the State's witnesses testified that they had not seen this truck and their testimonies to this fact were offered to establish this fact. On cross-examination, defense counsel asked Ward if a BOLO (be on the lookout) had been issued for this truck. Ward's testimony on re-direct examination was merely an explanation of the reason why a BOLO was not issued for this truck. Thus, Ward's testimony was not hearsay and there was no error in the admission of this testimony. Clontz v. State, 531 So.2d 60 (Ala.Crim. App.1988); Brannon v. State, 549 So.2d 532 (Ala.Crim.App.), cert. denied (Ala. 1989). Furthermore, even if we had determined that Ward's testimony was hearsay, and thus should have been excluded, we fail to see how the appellant was prejudiced *251 by this evidence since several witnesses testified to the same evidence. Nelson v. State, 534 So.2d 1118 (Ala.Crim.App.) cert. denied (Ala.1988).

VII
The appellant asserts that he was denied a fair trial because the victim's daughter, Nancy Miller, was allowed to sit at the prosecutor's table during trial. We disagree.
"The victim of a criminal offense shall be entitled to be present in any court exercising any jurisdiction over such offense and therein to be seated at the counsel table of any prosecutor prosecuting such offense or other attorney representing the government or other persons in whose name such prosecution is brought." Ala.Code, § 15-14-53 (1975) (Supp.1989).
"Whenever a victim is unable to attend such trial or hearing or any portion thereof by reason of death; disability; hardship; incapacity; physical, mental, or emotional condition; age; or other inability, the victim, the victim's guardian or the victim's family may select a representative who shall be entitled to exercise any right granted to the victim, pursuant to the provisions of this article." Ala.Code, § 15-14-56 (1975) (Supp.1989).
Clearly, Miller had a right to be present in the courtroom and to be seated at the prosecutor's table during the trial of the person accused of killing her mother. Kuenzel. See also St. John v. State, 523 So.2d 521 (Ala.Crim.App.1987), cert. denied (Ala.1988); Crowe v. State, 485 So.2d 351 (Ala.Crim.App.1984), rev'd on other grounds, 485 So.2d 373 (Ala.1985); Brodka v. State, 53 Ala.App. 125, 298 So.2d 55 (1974). See also Henderson.

VIII

A
The appellant contends that the jury improperly considered "victim worth and victim impact evidence" during the guilt phase of the appellant's trial in violation of Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). We note that the holdings in both Booth and Gathers are limited to the improper jury consideration of victim impact information during the sentencing phase of a capital murder trial and neither case addresses whether consideration of this type of information in the guilt phase would prejudice a jury during the sentencing phase. See Lesko v. Owens, 881 F.2d 44, 64 n. 7 (3d Cir.1989) (Cowen, J., dissenting), cert. denied, ___ U.S. ___, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990).
The appellant contends that several of the prospective jurors' characterizations of the victim during voir dire (e.g., victim was "a very lovely person") violated Booth and Gathers. We can find no authority to support the appellant's contention in this regard. Booth involved state-sanctioned evidence which contained victim impact information, and Gathers involved prosecutorial argument concerning the personal characteristics of the victim. Furthermore, we have reviewed each of the prospective jurors' comments about which the appellant complains and we do not conclude that the appellant was prejudiced in any way by these characterizations. We must also note that the appellant did not object to any of the characterizations by these certain members of the venire.
The appellant also alleges that the prosecutor's reference to the victim during his opening statement violated Booth and Gathers. The comment to which the appellant refers is as follows:
"She was a sixty-nine year old widow that lived by herself, fiercely independent and managed her own life and her own affairs. Life was good to her. She has a daughter, Nancy Miller, who is here today who lives with her husband in Dothan. Her mother was a very old lady and she was fairly independent. Mrs. Miller looked after her mother on occasion and would visit her once or twice a week." (R. 920.)
*252 No objection was made to the prosecutor's argument, and we do not find anything improper with his comments. A prosecutor is allowed to argue to the jury what he expects the evidence to show. Furthermore, this evidence does not even approach the type of prejudicial information to which the jurors were exposed in Booth and Gathers.
The appellant also contends that Nancy Miller's testimony concerning the fact that "she was an only child, that she visited her mother often, and that her mother did not drink or smoke," that "she was the one responsible for closing out her mother's estate, and [that] she `took care of her affairs' upon her death" should not have been admitted because it was irrelevant. (Appellant's brief, p. 71) This argument is meritless. These matters were certainly relevant within the context of the facts of this case.

B
The appellant also contends that there were Booth and Gathers violations during the sentencing phase of the trial. He asserts that the prosecutor improperly argued "that the victim's life was worth a great deal" by a comment the prosecutor made during his closing argument during the sentencing phase of the trial. The prosecutor's comment is as follows:
"When I speak of human values, I'm not talking about one person's soul being worth more than another person. But, when I talk about human values and the value of life, I'm not talking about the value of his life as compared to the value of Mrs. Brook's life.
"MR. ELDRIDGE: Judge, we object. That's improper argument as to the value of my client
"THE COURT: I overrule your objection.
"MR. EMERY: Ladies and Gentlemen, it's not a question of whose life is worth more, but it is a question that comes up in a criminal justice system as to the value that we're going to put on her life. We can not forget Mrs. Brooks' life. What is the price in our criminal justice system of taking another life? That is the question. In determining that, you must look at the values I have mentioned." (R. 1579-80.)
Although the emphasized portion of the prosecutor's argument, when viewed in isolation, appears to suggest that a different emphasis should be placed on the victim's life, it is clear that the argument, when considered in totality, addresses the value of human life in general. We find nothing improper in this argument. Furthermore, this comment was "markedly different in scope and tone from the evidence condemned" in Booth and Gathers. Bertolotti v. Dugger, 883 F.2d 1503, 1528 (11th Cir.1989). See also Gilmore v. Armontrout, 861 F.2d 1061, 1069 (8th Cir.1988), cert. denied, 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989).
The appellant also contends that the judge improperly considered information contained in the presentence report in violation of the principles set out in Booth. After the jury made its sentencing recommendation, the trial court ordered a presentence report. After its preparation, the presentence report was received and considered by the trial court (R. 241-42) Included in this report was a victim impact statement made by the victim's daughter, Nancy Miller. Her statement reads as follows:
"I am an only child. My daddy is deceased. I cannot accept this crime and therefore have sought psychological counseling. I feel that in order for me to give a view as to how this tragedy has effected me so far, I need to go back in my life some years. I will try to be as brief as possible.
"I am an only child born when my parents were in their late thirties. They had been married for seventeen years then. As a child I can remember many, many good times. I had lots of friends, family vacations, and hard-working, loving parents. My daddy worked in retail furniture until he was stricken with lung cancer and died seven months later. I was eighteen years old. I lived at home with my parents, and attended college nearby.

*253 It was very hard to watch my daddy dying, but a disease took his life. After my daddy's death my mother and I became closer than ever. She had worked with the Civil Service for thirty-four years before her retirement in 1973. I was sixteen years old. We did things that mothers and daughters do like shopping, cooking, vacationing and most of all talking. We could communicate. She was my best friend. A few years later I got married. My mother then began joining various clubs and meeting new friends. I lived in Geneva with my husband until 1986. Lunch was my favorite time of day. That was a daily visit with my mother. Most nights we didn't go to bed without calling to check on each other. When my husband and I moved to Dothan, my mother and I kept our closeness. Although we didn't see each other every day, we did have at least one day, usually more, a week to visit face to face. We never let more than two days go by without a telephone visit. Even while vacationing with her friends from AARP and New Horizon (a club for widows only), she would always call to let me know she was fine and to see how we were doing. We had respect for each other. If she was going out of town maybe dining out, visiting, or shopping she always let me know and I did the same with her. I loved my mother very, very much and she returned the love. I miss her terribly. I wake up every morning and go to bed every night thinking about her. I think of how afraid she must have been when she was bound and gagged and the life literally being beaten out of her. There is not a day or night that I am not reminded of her. Whether I am running errands or staying home there is always something or someone there to remind me. I loved my daddy very, very much also but, his death I can accept. Unlike his death from disease, my mother died a senseless death at the hands of another person. I will never understand how a human being could so brutally murder another. Especially not my mother. She had so much to live for. Her family, friends, vacations, and meetings were so important to her. She loved life and did not deserve what happened to her. There are no words to explain my pain, it is indescribable." (R. 190-193)
The victim impact statement also included Miller's opinion of the appropriate punishment in this case:
"DeathIt is my belief: `Eye for eye, tooth for tooth....' (Exodus 21:24) `.... the murderer shall be put to death.' (Numbers 35:16,17,18,21)" (R. 191)
In Booth, the United States Supreme Court held that the admission into evidence, during the sentencing phase of a capital murder trial, of a victim impact statement which "described the personal characteristics of the victims and the emotional impact of the crimes on the family" and "set forth the family members' opinions and characterizations of the crimes and the defendant" violated the Eighth Amendment since "this type of information is irrelevant to a capital sentencing decision, and that its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." Booth, 107 S.Ct. at 2533. Clearly, under Booth, reversible error would have occurred if the jury had been exposed to the victim impact statement that is quoted above. See McGahee v. State, 554 So.2d 454 (Ala.Crim. App.), aff'd, 554 So.2d 473 (Ala.1989) (victim's brother's testimony that he took a shotgun and went looking for the defendant when he found out his sister had been shot was inadmissable victim impact information). Nevertheless, in Ex Parte Martin, 548 So.2d 496, 497 (Ala.), cert. denied, ___ U.S. ___, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989), the Alabama Supreme Court found no error when only the trial court, and not the jury, considered the victim impact statement. See also Kuenzel, 577 So.2d 474 at 527. However, as noted in both Martin and Kuenzel, there was very little victim impact information contained within the presentence reports considered by the trial judges in those cases. In Martin, the victim impact information comprised only three sentences in a 36-page *254 report. In Kuenzel, the victim impact statement was "relatively innocuous in that it contain[ed] very little information about the victim's personal characteristics, the emotional impact of the crime on the victim's family, and the family member's opinion about the crime and the defendant." Kuenzel, at 527.
Here, Miller's statement was included on 5 of the 45 pages of the presentence report (we note that 31 of the pages contained in the report dealt with certified copies of the appellant's convictions from another state). As can be seen above, the victim impact statement, included in the presentence report considered by the trial judge, contained detailed and significant information concerning the victim's personal characteristics, the emotional impact of the crime on the victim's daughter and her opinion about the crime and the appellant. In fact, the information contained in the presentence report closely parallels that contained in the victim impact statement in Booth. Therefore, in an abundance of caution, we think it best to remand this cause to the trial judge with instructions that he resentence the appellant and issue new written findings. In doing so, we explicitly instruct the trial court not to consider the victim impact information contained in the presentence report.

IX
The appellant contends that "[i]f the State proves that one or more statutory aggravating factors are present, the [Alabama Death Penalty] statute requires the jury to impose death unless the defendant shows that mitigating circumstances exist in the case, and that they outweigh aggravation." He further argues that "[b]ecause Alabama's statute, as applied in the instructions given at [the appellant's] trial, requires the sentencer to presume that death is proper and to impose death unless a defendant proves that mitigation exists and that mitigation outweighs aggravation, the statute on it face, and as applied here, violates the Eighth and Fourteenth Amendments." (Appellant's brief, p. 91-92.) The appellant cites Jackson v. Dugger, 837 F.2d 1469 (11th Cir.), cert. denied, 486 U.S. 1026, 108 S.Ct. 2005, 100 L.Ed.2d 236 (1988) as authority and asserts that the "jury instructions struck down in Jackson are, literally and in effect, identical to the instructions given at [the appellant's trial]." (Appellant's brief, p. 92.) This is incorrect.
In Jackson, "the terminology that death is presumed appropriate seeped into the sentencing instructions given by the trial judge" to the jury. Jackson, 837 F.2d at 1473. The trial judge gave the following instruction:
"`When one or more of the aggravating circumstances is found, death is presumed to be the proper sentence unless it or they are overridden by one or more of the mitigating circumstances provided.'"
Jackson, 837 F.2d at 1473. In its opinion, the Eleventh Circuit condemned the trial court's instruction to the jury and held that "[s]uch a presumption, if employed at the level of the sentencer, vitiates the individualized sentencing determination required by the Eighth Amendment." Jackson, 837 F.2d at 1473.
The situation in Jackson did not exist in this case. We have thoroughly reviewed the trial court's instructions to the jury during the sentencing phase of the trial and do not find any evidence that the trial court instructed the jury that death is presumed to be the appropriate penalty. Furthermore, Alabama's "statutory sentencing scheme does not provide, that if even one aggravating circumstance is found, `death is presumed to be the proper sentence' unless overcome by sufficient mitigating circumstances." Cochran v. State, 500 So.2d 1161, 1177-78 (Ala.Crim.App.1984), affirmed in part, reversed on other grounds, 500 So.2d 1179 (Ala.1985). See also Kuenzel.
The appellant also seems to argue that the trial court's instructions at the sentencing hearing placed some restrictions on the evidence the jury could consider as mitigating circumstances. The trial court clearly instructed the jury that they could consider any aspect of the appellant's character, record, or any circumstance of the crime as *255 mitigating circumstances. Further, the trial judge told the jury that the list of mitigating circumstances that he listed was not exhaustive and stated that they could consider any evidence that they had heard in mitigation. This argument lacks merit.

X
The appellant alleges that "once the jurors decided he was guilty, death was presumed to be the necessary punishment [because one aggravating circumstance was established by the appellant's conviction], and it immediately fell to Mr. Pierce to convince the jurors otherwise." (Appellant's brief, p. 97.) As we stated in Issue IX, "Alabama's `statutory sentencing scheme does not provide, that if even one aggravating circumstance is found, "death is presumed to be the proper sentence" unless overcome by sufficient mitigating circumstances.' Cochran v. State, 500 So.2d 1161, 1177-78 (Ala.Cr.App.1984), affirmed in part, reversed on other grounds, 500 So.2d 1179 (Ala.1985). Neither the oral charge of the trial judge nor Alabama's statutory sentencing scheme `presume' that death is the appropriate punishment upon the finding of the existence of at least one aggravating circumstance." Kuenzel, at p. 521. Thus, there is no "automatic death penalty" upon conviction of a capital offense for which there is an "overlap" between one of the elements of the offense and a statutory aggravating circumstance. Kuenzel.

XI
The trial court gave the following instruction to the jury during the guilt phase of the trial:
"In arriving at your verdict, you must not permit sympathy, prejudice, or emotion to influence you." (R. 1521.)
Then, during the sentence phase of the trial, the court gave the following charge to the jury:
"It is my duty again to instruct you or to charge you as to the law. In charging you, I want to remind you of the instructions that I gave you yesterday concerning the basic law defining the terms reasonable doubt and moral certainty, as well as your duties and functions as a juror.
"....
"The same instructions that I gave you yesterday afternoon still go today, so far as those terms are concerned." (R. 1592-93.)
The appellant now claims on appeal that the trial court's instructions quoted above, when viewed together, had the effect of precluding the jury from considering sympathy and mercy when determining sentence.
In Julius v. Jones, 875 F.2d 1520 (11th Cir.), cert. denied, ___ U.S. ___, 110 S.Ct. 258, 107 L.Ed.2d 207 (1989), the Eleventh Circuit Court of Appeals affirmed the district court's order and amendment in the case and attached the district court's order and memorandum opinion as an appendix to the Eleventh Circuit's opinion. The exact issue before us was addressed by the district court judge in his memorandum opinion: In Julius,
"[P]etitioner argue[d] that the trial court's instruction at the guilt phase of the trial that `no sympathy, bias or prejudice for any person or individual should enter in your deliberations in rendering a verdict in this case ...,' and afterwards the instruction at the sentencing phase that `I want to again remind you of the charge I gave you earlier concerning the basic law, as far as reasonable doubt and moral certainty are conerned, as well as your functions as jurors ...' offended the Eighth Amendment requirement that a capital sentencer be free to consider any evidence or factor offered by the defendant as a reason for a sentence less than death. Petitioner argue[d] that his sentencer was precluded from considering his mitigating evidence before making its sentencing decision. This Court disagrees.
"In evaluating this alleged constitutional error, the Court must determine how a reasonable juror could construe the instruction. Francis v. Franklin, U.S. 307, 105 S.Ct. 1965, 1971-1972, 85 L.Ed.2d 344 (1985). The court first *256 notes that the trial court did not repeat its previous instruction as to sympathy, but rather referenced `the basic law, as far as reasonable doubt and moral certainty are concerned,' which was contained in the charge in the guilt phase of the case. The reference to sympathy in the guilt phase was clearly an instruction which would benefit an accused. It is illogical to believe that the jurors thought that the reference to sympathy in the guilt phase applied to the sentencing phase, especially given the instructions which followed the reference to which petitioner now objects. The trial court specifically instructed the jury at the sentencing phase that
... You can consider the evidence you heard in the guilt phase in considering any aggravating or mitigating circumstances at the present stage of the case. And that is what this hearing is all about, for you to consider and weigh aggravating circumstances and mitigating circumstances against each other in determining what the punishment for the Defendant will be in this case. You are to consider all relevant evidence, not only as to why the death sentence should be imposed, but to weigh and consider all of the evidence as to why it should not be imposed ...
"Record at 303-304. Furthermore, the trial court instructed the jury that
Now the fact that I list these mitigating circumstances to you does not mean that those are the only mitigating circumstances that you can consider in this case. That is not meant to be an all inclusive of mitigating circumstances. You may find that there are other mitigating circumstances in this case from the evidence you heard and from anything that you may have heard in the evidence about Defendant's character or his life ...
"Record at 308. Given these instructions as a whole, this Court finds a reasonable juror could not have construed that the trial court's instruction prohibited the jury at the sentence phase from considering mitigating evidence regarding petitioner's character and background."
Julius, 875 F.2d at 1528-29.
The factual situation in the case at bar is very similar to that in Julius. The trial court's allegedly erroneous instructions during the guilt and sentencing phases of both trials were nearly identical. Here, the trial judge gave comparable instructions to those in Julius concerning the existence of mitigating circumstances. The trial court stated that the jury could consider any evidence in determining the existence of any mitigating circumstances, including evidence of the appellant's character or record or any circumstances of the crime. Thus, we, like the district court in Julius, conclude that the trial court's instruction could not have been construed to preclude the jury from considering mercy and sympathy in their sentencing decision.
Furthermore,
"in California v. Brown, 479 U.S. 538, 107 S.Ct. 837 [93 L.Ed.2d 934] (1987), the Supreme Court decided that an instruction informing jurors that they `must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling' during the penalty phase of a capital murder trial does not violate the Eighth and Fourteenth Amendments to the United States Constitution."
Kuenzel, at p. 496. See also Saffle v. Parks, ___ U.S. ___, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990).
"Because the individualized assessment of the appropriateness of the death penalty is a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence, I agree with the Court that an instruction informing the jury that they `must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling' does not by itself violate the Eighth and Fourteenth Amendments to the United States Constitution. At the same time, the jury instructionstaken as a wholemust clearly inform the jury that they are to consider any relevant mitigating evidence *257 about the circumstances of the crime."
Kuenzel, at p. 496 (quoting concurring opinion of Justice O'Connor in Brown, 107 S.Ct. at 841).
As we stated above, the trial court's oral charge explicitly informed the jury that they were to consider any evidence in mitigation, including anything concerning the defendant's character or record and the circumstances of the crime. Thus, we do not find that the above instructions by the trial court violated any rights of the appellant. See Kuenzel (and Alabama cases cited therein).

XII
The appellant contends that "because the collective `you' was used throughout the jury instructions to refer to all twelve jurors," the jurors "reasonably could have believed that mitigation had to be unanimously found." (Appellant's brief, p. 105.) This argument has been addressed and rejected by Ex Parte Martin, 548 So.2d 496 (Ala.), cert. denied, Martin v. Alabama, ___ U.S. ___, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). See Kuenzel at pp. 521-22

XIII
During the sentencing hearing, the State introduced evidence of ten prior felony convictions of the appellant. The appellant argues on appeal that the jury could have improperly considered these convictions as non-statutory aggravating circumstances. We disagree. The jury was clearly instructed that the sole aggravating circumstance they could consider, if they found that it was proven beyond a reasonable doubt, was that "[t]he capital offense was committed while the Defendant was engaged in or was an accomplice in the commission of or an attempt to commit or flight after committing or attempting to commit robbery [§ 13A-5-49(4), Code of Alabama 1975]." (R. 1597.)
The record clearly reveals that the appellant's prior convictions were introduced to disprove the statutory mitigating circumstance that the appellant has no significant history of prior criminal activity (§ 13A-5-51(1), Code of Alabama 1975). See R. 1540. This issue is without merit.
The appellant also raises several additional issues in the footnotes to his brief. We have carefully considered each of these issues and have determined that none of them are meritorious or deserve discussion by this Court. Furthermore, we can find no plain error which occurred during the guilt phase of the trial or during the sentencing phase of the trial at which the jury participated. However, as we stated above in issue VIII B, this case is remanded to the trial court with instructions that he enter new written findings in this case without consideration of the victim impact statement contained in the presentence report.
The appellant's conviction is affirmed. The cause is remanded to the trial court with instructions.
AFFIRMED IN PART; REMANDED IN PART WITH INSTRUCTIONS.
All the Judges concur.
BOWEN, J., concurs in result with opinion.
McMILLAN, J., concurs in result only.
BOWEN, Judge, concurring in result.
Although I concur in the result reached by the majority, I continue to adhere to the principle expressed in my dissent in Gordon v. State, [Ms. 8 Div. 496, May 25, 1990] (Ala.Cr.App.1990), that a white defendant has standing to raise a "Batson" objection. See Part I of the opinion of the majority. I see no plausible reason for this Court to await "direction" from any other court on this issue.
NOTES
[1] The "fair cross section" requirement under § 12-16-55, Code of Alabama 1975, and under the Sixth Amendment to the United States Constitution are analogous. Rayburn v. State, 495 So.2d 733 (Ala.Crim.App.1986).
[2] We must note that this Court is not unanimous in its holding on this issue. In his dissent in Gordon, Judge Bowen stated that, in his opinion, a white defendant has standing to assert this type of claim under the United States Constitution, the Alabama Constitution and the Code of Alabama. While the United States Supreme Court has not expressly addressed this issue, there is some indication that the Supreme Court would find that a white defendant could raise this issue under the Fourteenth Amendment. See Justice Marshall's dissent in Holland v. Illinois, 493 U.S. 474, 110 S.Ct. 803, 813-14, 107 L.Ed.2d 905 (1990) (majority held that racial exclusion of blacks from jury does not violate Sixth Amendment).